AERATION PROCESSES, INC. & another *vs.* COMMISSIONER
OF PUBLIC HEALTH & others.

Middlesex.    October 9, 1963. — December 6, 1963.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, SPIEGEL,
& REARDON, JJ.

*Food. Constitutional Law,* Police power, Due process of law, Food.
*Words,* "Imitation."

In the provision of the "First" paragraph dealing with food in G. L. c. 94,
§ 187, as amended through St. 1948, c. 598, § 2, that "this paragraph
shall not be construed to permit the imitation of any food for which a
standard has been established by law, other than as specifically provided
herein," the word "herein" refers to the whole of c. 94 and not merely to
. § 187 [547]; the word "imitation" has the same meaning wherever used
in that paragraph [551].
A new, nutritious vegetable substitute for cream, closely resembling cream,
distributed for use in coffee in public and employer maintained eating
places where the average consumer would be likely to mistake it for
cream was an "imitation" of cream within G. L. c. 94, § 187, as amended
through St. 1948, c. 598, § 2, and, in view of the statutory standard
established for cream in c. 94 and absence of any specific provision
therein permitting such imitation, was "misbranded" within § 187, irre-
spective of its quality as compared with cream, of any intent to defraud,
of the truthfulness of the labeling on the bulk package in which it
was sold, or of intent to imitate [550–554]; such application of § 187
to the product as so distributed, with the attendant consequences under
§§ 189A, 191, was not an improper exercise of the police power viola-
tive of the Fourteenth Amendment to the Federal Constitution [554–
555].

BILL IN EQUITY filed in the Superior Court on July 21,
1961.

The defendants appealed from a final decree entered
after hearing by *Smith, J.*

*David L. Turner,* Assistant Attorney General, for the
defendants.

*John N. Kelly (Howard F. Ryan* with him) for the plain-
tiffs.

WHITTEMORE, J.   This bill of complaint seeks a declara-
tion as to the applicability of G. L. c. 94, § 187, as amended

through St. 1948, c. 598, § 2,[1] to Instantblend, a vegetable product resembling cream and served and used with coffee at public, or employer maintained, eating places.

The plaintiffs are Aeration Processes, Inc. (Aeration), an Ohio corporation which owns the formula of Instantblend, and Instantwhip-Boston, Inc., a Massachusetts corporation, which as a licensee of Aeration manufactures and sells Instantblend within the Commonwealth. Aeration "purchase[s] and . . . [has] prepared certain dry mixtures that the Instant Whip Companies use in manufacturing their products." The defendants are the Commissioner of Public Health, the Director of the Division of Food and Drugs, and the Attorney General. No one has contended that any defendant is not a proper or necessary party.

Section 187 of c. 94[2] declares food misbranded if "in imitation or semblance of any other food" unless, in certain cases, labeled as such an imitation. But it does not permit the imitation, even with labeling, "of any food for which a standard has been established by law, other than as specifically provided herein." The words "specifically provided herein" must refer to all of c. 94, rather than merely to § 187, as that section makes no provision allowing the imitation of a food for which there is a statutory standard. There are in c. 94 some sections that allow the imitation of foods for which standards are set by statute provided

---

[1] Subsequent amendments of § 187 have not changed the paragraph herein construed.

[2] General Laws, c. 94, § 187, as amended through St. 1948, c. 598, § 2, provides, in part: "For the purposes of said sections an article shall also be deemed to be misbranded: —. . . In the case of food: First, if it is in imitation or semblance of any other food; provided, that this paragraph shall not apply to an imitation of a food for which a standard of quality or identity has been adopted under the provisions of section one hundred and ninety-two, nor to an imitation of any other food for which no standard has been established by law or regulation, if its label bears in type of uniform size and prominence, the word 'imitation,' and, immediately thereafter the name of the food imitated; and, provided further, that this paragraph shall not be construed to permit the imitation of any food for which a standard has been established by law, other than as specifically provided herein."
Section 192 of c. 94 grants the Department of Public Health power to promulgate regulations setting standards for foods where standards are not otherwise prescribed by law.

labeling requirements more specific than those of § 187 are met. See §§ 49, 54, oleomargarine; § 50, "imitation cheese"; § 1, definitions of butter and cheese.

Statutory standards for cream and ungraded cream are established by G. L. c. 94, § 12,[3] as amended through St. 1955, c. 757, § 2. Chapter 94 contains no provision that permits the imitation of cream by combining nonmilk constituents. Section 17A prohibits the manufacture, sale or possession for sale, of milk, cream or skimmed milk to which any fat or oil other than milk fat has been added "so that the resulting product is in imitation or semblance of milk, cream or skimmed milk . . . ." The addition of milk fat to such products is, however, not prohibited by § 17A provided the product is not sold as pure milk.[4]

Hence, if Instantblend is an "imitation" of cream it is misbranded however labeled or sold and is subject to an embargo under c. 94, § 189A; also, whoever delivers or offers to deliver such a misbranded product is subject to the criminal penalty provided in c. 94, § 191.

The final decree, from which the defendants have appealed, ruled inter alia that G. L. c. 94, § 187, is constitutional; Instantblend is not an imitation milk product; the application of § 187 to Instantblend would be unconstitutional. It enjoined the defendants from prosecuting anyone for distributing, marketing or selling Instantblend or interfering with its distribution, use or sale.

There are findings and rulings; the evidence is reported.

The testimony of a vice-president of Aeration shows that Aeration, in the course of licensing the sale of two other nondairy products — Instantwhip and Instantwhip Top-

---

[3] General Laws c. 94, § 12, provides, in part: "The Massachusetts legal standard for cream or ungraded cream shall be cream which upon analysis is shown to contain not less than sixteen per cent of milk fat. The Massachusetts legal standard for the grades to be known as light cream, medium cream, heavy cream and extra heavy cream shall be cream which upon analysis is shown to contain not less than sixteen, twenty-five, thirty-four and thirty-eight per cent, respectively, of milk fat."

[4] "No person . . . shall sell . . . or have in his possession with intent to sell . . . as *pure milk,* any milk, cream, or skimmed milk . . . to which has been added . . . any milk fat" (emphasis supplied).

ping — noticed the sale by competitors of certain "vegetable fat coloring agents," and thereupon, in order to maintain its share of the market, developed Instantblend. It was designed as a product that "would color coffee so it would give a commodity a pleasing appetizing appearance."

Instantblend is a pasteurized blend of water, hydrogenated vegetable oils, dextrose, sucrose, enzyme modified casein, mono and di glycerides, protein stabilizers, salt, and artificial color and flavor. The vice-president's testimony also shows that he with two others associated with Aeration did the work in developing Instantblend and that in his view the color of Instantblend is very close to that of cream; it pours like cream and in coffee the average person cannot tell from the taste whether it is cream.

Other testimony shows that, closely observed, Instantblend is somewhat different from cream. In color it is white as against the yellow tinge of cream, and it differs somewhat in taste when not in coffee, being sweeter and having perhaps a chalky taste. Its viscosity is less than that of cream, and more like that of milk.

Instantblend has certain advantages; it does not feather (or separate so that its fat content rises) when added to coffee at a high temperature as cream sometimes does; it does not spoil as quickly as cream. In coffee dispensing machines it does not clog the separate chute through which it flows, in contrast to cream, which tends to do so because of its calcium content. Some attributes, such as the absence of butter fat, may be thought by some consumers to be an advantage.

The Director of the Division of Food and Drugs testified that Instantblend is "nutritional," though of different nutritional value from cream, and the defendants, by counsel, in effect so conceded.

The evidence shows that Instantblend is sold, sometimes through distributors, for use in restaurants or at lunch counters or in "vending machines . . . placed in various locations" in factories. The defendants do not contend that the label on the bulk package in which Instantblend is

sold does not fully disclose its composition; the judge, having a package before him as an exhibit, found that it is truthfully labeled with a full disclosure of its ingredients.

The plaintiff Instantwhip-Boston, Inc., with the sale of Instantblend, provides signs for posting in the retailers' premises to be put on the dispenser. These signs in varying sizes of type read, "Especially for You! For a Delicious Coffee We Use Instantblend A Non-Dairy Product."[5]

There was evidence that when an inspector from the Division of Food and Drugs, at a lunch counter, ordered a cup of coffee with cream on the side he was served black coffee and a one ounce glass container of a white liquid (later identified by the manager as Instantblend) taken from a dispensing device or "creamer." He saw no sign on the creamer and was sure that there was none.

The evidence thus supports the judge's findings that Instantblend "has some distinctive appearance and texture," that the plaintiffs do not intend to offer it as milk or cream, that it is truthfully labeled and is a nutritious, distinctive food product of Aeration's own research and invention. The judge's conclusion, however, that although Instantblend "may have some appearance of cream," it is not a substitute, nor is it an imitation under G. L. c. 94, § 187, is not justified. The plaintiffs, in effect, themselves assert that Instantblend is a substitute for cream; the reasons for our ruling that this intended substitute is an imitation of cream are next stated.

1. *Instantblend is an imitation of cream within the meaning of G. L. c. 94, § 187.*

The statute is designed to avoid confusion of other products with defined and familiar foods. Section 187, read with § 12, reflects the policy that the public shall not be exposed to the risk of mistaking for cream, milk or skimmed milk something that is not that product as defined by the statute. See *Carolene Prods. Co.* v. *United States,* 323 U. S. 18.

---

[5] This sign, of course, falls short of a clear statement that Instantblend is a product to be added to black coffee in place of cream.

The meaning of "imitation" is not limited to a substance inferior to the product which it resembles. There is no suggestion of such a limitation in those provisions of § 187 which define "misbranded" to include the "imitation" of a food. Compare the wording of paragraphs Fifth and Sixth of § 187 (food) under which inferiority may be an element. Compare also Federal Food, Drug, and Cosmetic Act, § 402 (b) (4), 52 Stat. 1046–1047 (1938), 21 U. S. C. § 342 (b) (4) (1958); *United States* v. *88 Cases, More or Less, Containing Bireley's Orange Beverage,* 187 F. 2d 967, 972 (3d Cir.), cert. den. 342 U. S. 861.

Intent to pass off, impose or defraud is not required as a test of an imitation. *United States* v. *651 Cases, More or Less, of Chocolate Chil-Zert,* 114 F. Supp. 430, 433 (N. D. N. Y.), and cases cited. Compare G. L. c. 94, § 187 (misbranding of food), "Seventh, if the package containing it or its label bears any statement, design or device regarding the ingredients or the substances contained therein which is false or misleading in any particular." The *Chil-Zert* case, *supra,* holds that a product resembling ice cream made with soy fat and soy protein and labeled "not an ice cream" is an imitation and is misbranded under § 403 of the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1047–1048 (1938), 21 U. S. C. § 343 (1958). This, because the statute itself in specifically providing the mode of labeling which will prevent the product from being characterized as misbranded precludes consideration of the truthfulness of nonstatutory labeling. Section 187 of our statute likewise has a specific labeling provision in all cases save where the food is one for which there is a statutory standard. In our opinion this provision precludes consideration of the veracity or effect of food product labeling in determining whether the product is an imitation. The word "imitation" has the same meaning throughout paragraph First of § 187 (food). Its meaning is the same where the food imitated is one for which a standard is set by statute (and, which therefore, may not be imitated even with a label) as for a food for which there is no such statutory standard and which may be imitated if labeled as the statute requires.

The plaintiffs rely on *Commonwealth* v. *New England Maple Syrup Co.* 217 Mass. 432, 434. The issue there was under R. L. c. 75, § 18, cl. 4, which declared food adulterated if "in imitation of or . . . sold under the name of another article." Although the court held that there was another basis for finding adulteration, it said that likeness in color and consistency between maple syrup and a syrup made by compounding maple sugar, water and granulated cane sugar (which the agreed facts showed contained no artificial coloring) was not enough to classify the latter syrup as an imitation; "nothing in the labels . . . or upon the cork . . . [was] calculated to show any attempt at such imitation . . . ." This statement might be taken as averring that an intent to mislead by mislabeling was necessary before a product could be characterized as an imitation under that statute. However, R. L. c. 75, § 18, forbade the sale of imitation foods and did not provide an exception for foods labeled as imitations such as is found in the present statute.[6] Thus, while a misleading label might appropriately be a condition of holding that a product was an imitation under the old statute involved in the *New England Maple Syrup* case, *supra,* that case is not authority for making such a label a condition of holding that a product is an imitation under the present statute.

The plaintiffs further contend, however, that intention to imitate is a part of the statutory test and that Aeration's intent was not to imitate but to create a new and superior product. The short answer to this is that the mental state of a food processor or food manufacturer bears no necessary relation to whether an average consumer would confuse a product with a defined or established food. In this respect our statute resembles the Federal Filled Milk Act, 21 U. S. C. §§ 61–64 (1958), which has been held to apply to products "in imitation or resemblance of milk" even though the imitation or resemblance results from ingredients used and is not the result of conscious effort. *Caro-*

---

[6] Exception was made for compounds and blends properly labeled.

*lene Prods. Co.* v. *United States,* 323 U. S. 18, 25. Compare, as to oleomargarine under a State statute, *People* v. *Guiton,* 210 N. Y. 1, 4, 6–7.

Even if the issue were relevant, we think it inescapable that Aeration had an intent to make, as it did make, a product which would closely resemble cream when used for the purpose for which it was developed and sold. The intent was to make a product which in appearance, and in taste in coffee, would be fully acceptable to persons accustomed to taking cream in coffee. It is necessarily inferable that the addition of artificial color and flavor served that purpose and result. This intent to make the product resemble cream, and be substantially indistinguishable from it when used for its intended purpose, was in no wise inconsistent with the intent to make a new, distinctive product and in some respects, at least, a product more acceptable to those who serve it or consume it.

The plaintiffs cite *Midget Prods. Inc.* v. *Jacobsen,* 140 Cal. App. 2d 517, and *Aeration Processes, Inc.* v. *Jacobsen,* 184 Cal. App. 2d 836. So far as these cases under a different statute are in point we do not find them persuasive. In the *Midget* case the court ruled that the evidence sustained the finding below, that a topping used by bakers and others on pies, cakes, and other foods was not an imitation of a milk product which must be labeled in compliance with the statute and that to require labeling would be unconstitutional. The court distinguished the *Chil-Zert* case, 114 F. Supp. 430, *supra,* only on the ground that the Federal court had found that the ice cream substitute was an imitation. In the *Aeration* case, the California court ruled that the evidence of differentiation from whipping and whipped cream supported the finding that Instantwhip Topping was not an imitation milk product.

We hold that Instantblend is an imitation within § 187 because (1) it resembles cream but does not conform to the statutory standards therefor, (2) apart from information supplied by labeling, there is a likelihood that an average consumer, aware of Instantblend's intended use, will con-

fuse it with cream, and (3) there is no showing that Instant-blend and cream are so differentiated in the mind of the average consumer interested in the distinction that, by making reasonable effort, he would discover with which product he is confronted. That many attributes of Instant-blend differentiate it from cream does not take it out of the statutory category of an imitation. The significant properties are those which, being apparent, may cause it to be mistaken, or accepted, for cream.

2. *There is no showing that G. L. c. 94, §§ 187, 189A, and 191, would be unconstitutionally applied to the sale and distribution of Instantblend.*

The Fourteenth Amendment to the Federal Constitution does not bar State action prohibiting the sale of an admittedly nutritious product as a measure within the police power aimed at avoiding consumer confusion.[7] See *Hebe Co.* v. *Shaw,* 248 U. S. 297, 303–304; *Sage Stores Co.* v. *Kansas ex rel. Mitchell,* 323 U. S. 32, 35–36. Cf. *Carolene Prods. Co.* v. *United States,* 323 U. S. 18, 27–32. This record does not raise the issue whether such prohibition may be imposed under the State Constitution notwithstanding a showing that substantial confusion could not result because the product was distinctively labeled.[8] See *Commonwealth* v. *Huntley,* 156 Mass. 236, 241–242, affd. sub nom. *Plumley*

---

[7] The record, we think, is inadequate to present other questions under the Federal Constitution. As to the commerce clause the record does not clearly disclose the arrangement between Aeration and its Massachusetts licensee and does not show a discriminatory impact of the prohibitory statute on interstate commerce. See *Baldwin* v. *G. A. F. Seelig, Inc.* 294 U. S. 511, 526–528. Nor are the interstate aspects of the licensee's business sufficiently presented to disclose a conflict between the Federal Food, Drug, and Cosmetic Act, 21 U. S. C. §§ 301–348, and State law. See *United States* v. *40 Cases, More or Less, of Pinocchio Brand Oil,* 289 F. 2d 343 (2d Cir.), cert. den. 368 U. S. 831; *Savage* v. *Jones,* 225 U. S. 501, 529–540; *McDermott* v. *Wisconsin,* 228 U. S. 115; *Corn Prods. Ref. Co.* v. *Eddy,* 249 U. S. 427, 433–440. See also *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148; *Campbell* v. *Hussey,* 368 U. S. 297; *Florida Avocado Growers* v. *Paul,* 373 U. S. 132, 141–152.

[8] The regulation of the distribution of a nutritious product, used in place of a milk product and mistakable therefor, may be an appropriate alternative to its prohibition. See G. L. c. 94, §§ 49, 51–58, 60 (oleomargarine). Compare 1961 Senate Doc. No. 417 (a proposal, which failed of passage, for an exemption from regulation), "An Act relative to the use of certain food consisting of vegetable products and used as a light cream."

v. *Massachusetts,* 155 U. S. 461. Compare *State* v. *A. J. Bayless Mkts. Inc.* 86 Ariz. 193, and cases cited; *Coffee-Rich Inc.* v. *McDowell,* CCH Food, Drug and Cosmetic Law Rep. par. 40,047. The evidence shows only that Instantblend is distributed for use at public or employer maintained eating places. The labeling on the bulk package is, of course, inconsequential in respect of such use. The evidence shows that as presently distributed there is a substantial risk that Instantblend will be confused with cream. The supplying of signs for use on dispensers in eating establishments, which may not be used, or if used may not be seen, is not an adequate means of informing the consumer what he is consuming.

The facts do not require us to consider whether the statute would be unconstitutional in application if relied on to bar distribution in retail stores, or elsewhere, in such a way that consumers would be informed as to the nature of the product sold or served and there would be no reasonable possibility of their mistaking it for cream.

3. The final decree is reversed. A decree is to enter in the Superior Court declaring that Instantblend is an imitation of cream within the meaning of the word "imitation" in G. L. c. 94, § 187, and that the statute is not unconstitutional in its application to the methods used for distributing and dispensing Instantblend as described in this opinion.

*So ordered.*